IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**FLIK,**<br>**COINSPARK,**<br>**RYAN S. FELTON,**<br>**WILLIAM Q. SPARKS, JR.,**<br>**OWEN B. SMITH, and**<br>**CHANCE B. WHITE,**<br>      **Defendants,**<br><br>      **And**<br><br>**HYPERION HOLDINGS LLC,**<br>**STEPHANIE L. BROWN,**<br>**DALE W. FELTON, and**<br>**JENNIFER FELTON,**<br>      **Relief Defendants.** | **Case No.**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its

Complaint against Defendants FLiK, CoinSpark, Ryan S. Felton ("Felton"),

William Q. Sparks ("Sparks"), Owen B. Smith ("Smith"), Chance B. White

("White") (collectively, "Defendants"), and Relief Defendants Hyperion Holdings,

LLC ("Hyperion Holdings"), Stephanie L. Brown ("Brown"), Dale W. Felton

("Dale Felton"), and Jennifer Felton (collectively, "Relief Defendants"), alleges as

follows:

## SUMMARY

1.      Between August 2017 and June 2018, Defendants FLiK, CoinSpark

and Felton engaged in fraudulent and unregistered offerings of digital asset

securities, collectively reaping over $3 million in illegal profits from investors.

Shortly after each entity's offering concluded, Felton misappropriated the funds

raised in that offering and then moved on to his next venture.  Despite promising to

use the funds raised from investors to build the FLiK and CoinSpark online

platforms, Felton instead used the funds to buy a Ferrari, a million-dollar home,

diamond jewelry, and other luxury items for himself.  None of the proceeds were

used for any of the purposes described in the offering materials.

2.      From approximately August 20, 2017 to September 20, 2017, Felton

and FLiK, a purported video streaming platform promoted by Felton as "Netflix on

the blockchain," conducted a so-called "Initial Coin Offering" ("ICO"), through

which they raised approximately 539 ether ("ETH"), a digital asset worth

approximately $164,665 as of September 20, 2017, in exchange for FLiK "tokens,"

2

which were digital assets offered as investment contracts, and therefore securities (the "FLiK ICO"). Defendant Sparks worked with Felton on the FLiK ICO and, with Felton and others, directly or indirectly offered and sold FLiK tokens through the FLiK ICO.

3.      On August 17, 2017, prior to the start of the FLiK ICO, Felton transferred 60 million FLiK tokens to an ethereum blockchain address that he controlled. Over the next two months, Felton fraudulently promoted FLiK, including by publishing materially false and misleading statements on various social media platforms and on the FLiK website. During this same time period, Felton offered and sold FLiK tokens to investors located all over the world and in the United States through his account at a digital asset trading platform. (These offers and sales, as well as offers and sales during the FLiK ICO and Felton's subsequent offers and sales of FLiK tokens through June 2018, are referred to herein collectively as the "FLiK Offering.") Felton made these sales anonymously and transferred the proceeds to financial accounts in his own name or under his control. Felton also diverted the proceeds of the FLiK ICO to his own personal accounts.

4.      In addition to using the proceeds to purchase a house, cars, jewelry, and high-end home furnishings. Felton also transferred portions of the proceeds to

the Relief Defendants, Jennifer Felton (his wife), Brown (his sister), and Dale Felton (his father).

5.    In October 2017, Felton began working with White and Smith on a second offering, this time for a purported digital asset exchange called "CoinSpark."

6.    From February 14 through March 14, 2018, Felton and CoinSpark raised approximately 460 ETH (worth approximately $282,418 as of March 14, 2018) in an unregistered offering of digital assets called "SPARK tokens" ("CoinSpark ICO" or "CoinSpark Offering"), which were offered and sold as investment contracts, and therefore securities.  Defendants White and Smith worked on the CoinSpark ICO and, with Felton and others, directly or indirectly offered and sold SPARK tokens in the CoinSpark ICO.

7.    White and Smith promoted the SPARK ICO under false names, without disclosing that Felton had promised them full-time employment in connection with CoinSpark, if CoinSpark raised sufficient funds.

8.    On March 20, 2018, Felton transferred the ETH raised in the CoinSpark ICO to an ethereum blockchain address that he controlled.  Felton subsequently transferred the ETH to other blockchain addresses he controlled, and converted the ETH to other digital assets and U.S. dollars, before transferring the

funds to financial accounts in his own name or under his control, including accounts of Relief Defendants Jennifer Felton and Hyperion Holdings.  Felton also transferred all unsold SPARK tokens to a blockchain address under his control his own personal account, for his personal use.

9.    In early April 2018, Felton engaged in manipulative matched trades intended to create the false appearance of trading activity in SPARK tokens in order to artificially increase the trading price of SPARK tokens and to induce others to purchase SPARK tokens.

10.    In offering and selling FLiK and SPARK tokens, Felton, FLiK, and CoinSpark knowingly, recklessly, or negligently made and disseminated numerous materially false and misleading statements and engaged in other deceptive acts, including manipulative trading by Felton.

11.    The FLiK and CoinSpark Offerings were illegal offerings of securities for which no registration statements were filed or in effect, and as to which no exemption from registration was available.

## **VIOLATIONS**

12.    By virtue of the foregoing conduct and as alleged further herein,

a.    Defendants Felton, FLiK, and CoinSpark violated Section 5(a) and 5(c) of the Securities Act, and Section 17(a) of the Securities Act of

1933 ("Securities Act") [15 U.S.C. §§ 77(e)(a), 77(e)(c), 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ( "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

b.      Defendant Felton aided and abetted FLiK's and CoinSpark's violations of Section 5(a) and 5(c) of the Securities Act, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

c.      Defendants Sparks, White and Smith violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

d.      Defendant Felton violated Section 9(a)(1) of the Exchange Act [15 U.S.C. §78i(a)].

e.      Defendants White and Smith violated Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

f.      Relief Defendants Hyperion Holdings, Brown, Dale Felton, and Jennifer Felton received funds from Defendant Felton for which they gave no consideration and to which they have no right or legitimate claim.

g.      Defendants, unless restrained and enjoined by this Court, will continue to engage in the acts, practices, transactions, and courses of

business alleged in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

13.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) & (d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(1) & (d)(5)].

14.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Felton, FLiK, and CoinSpark, joint and severally, and Sparks separately, to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Felton, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company; (d) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (e) ordering Relief Defendants jointly and severally with Felton, FLiK, and CoinSpark to disgorge or return their ill-gotten gains and to pay prejudgment interest thereon; (f) prohibiting Defendants from participating, directly or

indirectly, in any issuance, purchase, offer, or sale of digital asset securities; and (g) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue is proper because the transactions, acts, practices, and courses of business constituting violations of federal securities laws occurred in the Northern District of Georgia. Defendants Felton, Sparks, Smith, and White all reside in the District, and resided in this District at the time of the events alleged herein, and Defendants FLiK and CoinSpark have their principal place of business in this District. Relief Defendants Brown and Jennifer Felton reside in this District, and Relief Defendant Dale Felton traveled to the District during the time of the events alleged herein. Relief Defendant Hyperion Holdings has its principal place of business in this District.

## DEFENDANTS

17.     **Ryan S. Felton**, age 46, resides in Atlanta, Georgia.  Felton is the

founder, sole owner, and sole officer of FLiK, CoinSpark, and Hyperion Holdings,

which all have their primary place of business in Atlanta, Georgia.

18.     **FLiK** is an unincorporated entity that had its principal place of

business in Atlanta, Georgia in 2017-2018.

19.     **CoinSpark** is an unincorporated entity that had its principal place of

business in Atlanta, Georgia in 2017-2018.

20.     **William Q. Sparks, Jr.**, 35, is the social media manager for rapper,

actor, and producer Clifford Joseph Harris, Jr. ("Harris") and resides in Atlanta,

Georgia.

21.     **Chance B. White**, 41, works in the film and film-editing industry and

resides in Atlanta, Georgia.

22.     **Owen B. Smith**, 40, works in the film and film-editing industry and

resides in Atlanta, Georgia.

## RELIEF DEFENDANTS

23.     **Jennifer Felton**, 46, is the wife of Felton and lives in Atlanta,

Georgia.  Jennifer Felton received approximately $32,000 in jewelry purchased

using the proceeds of the FLiK Offering, and approximately $25,000 in checks and

transfers and $11,400 in prepaid Bitcoin debit cards using the proceeds of the CoinSpark Offering.  Jennifer Felton also received, jointly with Felton, a home, cars, furniture, and other luxury goods purchased by Felton with the proceeds of the FLiK Offering.  As described below, these proceeds constitute ill-gotten gains because Jennifer Felton does not have a legitimate interest in them.

24.     **Dale W. Felton**, 75, is the father of Felton and lives in Navasota, Texas.  Dale Felton received approximately $100,000 from the proceeds of the FLiK Offering, which, as described below, constitute ill-gotten gains because Dale Felton does not have a legitimate interest in them.

25.     **Stephanie L. Brown,** 53, is the sister of Felton and lives in Cartersville, Georgia.  Brown received approximately $18,500 from the proceeds of the FLiK Offering, which, as described below, constitute ill-gotten gains because Brown does not have a legitimate interest in them.

26.     **Hyperion Holdings, LLC** is a limited liability company formed under the laws of Georgia, with its principal place of business in Atlanta, Georgia. Hyperion Holdings received approximately $124,250 from the proceeds of the CoinSpark Offering, which, as described further below, constitute ill-gotten gains because Hyperion Holdings does not have a legitimate interest in them.

### OTHER RELATED INDIVIDUAL

27.     **Clifford Joseph Harris, Jr.**, a.k.a. "T.I." or "Tip," 39, is an Atlanta-based rapper, actor, and producer.

### BACKGROUND ON DIGITAL ASSETS AND ICOS

28.     The term "digital asset" or "digital token" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including "cryptocurrencies," "coins," and "tokens."[1]  Entities have offered and sold digital assets in fundraising events, called "initial coin offerings" or "ICOs," in exchange for consideration, often other digital assets.  FLiK and CoinSpark each offered and sold digital assets as securities through ICOs.

29.     Generally, digital assets may entitle holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  These digital tokens may also be listed on online digital asset trading platforms, where they can be traded for other digital assets or fiat currency.  The digital tokens are often transferable immediately upon delivery to investors.

---

[1]     A blockchain or distributed ledger is a peer-to-peer database spread across a network, that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.  Blockchains or distributed ledgers can also record "smart contracts," essentially computer programs designed to execute the terms of a contract when certain triggering conditions are met.

30.     ICOs are typically announced and promoted through public online channels.  The prospectus soliciting the public to acquire tokens in the ICO is usually in the form of a "white paper," which constitutes marketing materials describing the project and the terms of the ICO.  To participate, investors may transfer funds to a unique digital address set up by the issuer, and the issuer may deliver tokens to the participants' unique digital address on a distributed ledger or blockchain.  This process may be partially automated through the use of a smart contract, as it was for the FLiK and CoinSpark ICOs.

31.     On July 25, 2017, the Commission issued the DAO Report of Investigation, advising that digital tokens or coins may be securities, and thus, subject to the federal securities laws.  Both the FLiK and CoinSpark ICOs occurred after the DAO Report was released.

## FACTS

### I.   FLiK

#### A.   FLiK, Felton, and Sparks Engaged in the Unregistered Offer and Sale of Securities through the FLiK Offering.

*Felton Launches the FLiK ICO*

32.     Felton was the owner of a small film production studio in Atlanta, which focused mainly on filming commercials.  In July 2017, shortly after failing

to raise funds for a film project and facing financial obligations, Felton began planning the FLiK Offering.

33.     Felton created a FLiK website and various social media accounts and prepared a white paper and other marketing materials for the FLiK ICO, which he subsequently published on public online channels.

34.     In the white paper, the FLiK website, and through various social media accounts, Felton described FLiK as a video-streaming platform that would accept FLiK tokens issued in the FLiK ICO as payment for content on the platform. Felton's offering and promotional materials for the FLiK ICO emphasized that FLiK tokens would appreciate in value with time, and highlighted the ability to trade them on digital asset trading platforms. In these materials, as well as in social media accounts, Felton also emphasized the potential profits from resale of the tokens, encouraging investors to wait until the FLiK token reached a sufficiently high resale price before selling.

35.     At the time of the FLiK Offering, the FLiK platform had not been built. Nonetheless, the white paper touted the film and entertainment industry experience of Felton and others on the FLiK team, including Harris, a well-known Atlanta-based rapper, actor, and producer, that gave them the skill set necessary to ensure FLiK's success.

36.     The terms of the FLiK white paper and marketing materials further provided that the funds raised in the FLiK ICO would be pooled and that a significant portion would be used by the FLiK management team to develop FLiK's online distribution platform to allow artists to sell or rent their work; to create a video streaming platform; to license content; and to generally market and promote the project.

*The FLiK ICO Solicited Investors Worldwide, Including in the United States*

37.     Felton conducted the FLiK ICO from August 20, 2017 through September 20, 2017.  During the FLiK ICO, investors could purchase FLiK tokens by sending ETH to the FLiK smart contract.  The FLiK website and social media accounts, which were hosted or accessible in the United States, solicited potential investors from around the world, including in the United States.

38.     Felton paid for Facebook advertisement campaigns to promote the FLiK ICO worldwide, including in the United States.  These ad campaigns, which ran from at least September 1, 2017 through September 11, 2017, specifically targeted male users, ages 18-50, located in the United States, among other places, whose interests included "ICO," "Investment," and "Investor."  The "text" of the ads, which appeared on these users' Facebook News Feeds, included "Video Streaming Built on the Blockchain. Co-Owned by T.I. [Harris]," which reached

over 2,000 users in the United States, including at least 64 users in Georgia, and

"FLIK ICO – Entertainment Revolution! 10 FLIK for Just .002 ETH!" which

reached over 4,000 users in the United States, including 96 users in Georgia.

39.     Sparks, a social media manager for Harris, engaged in selling efforts

for FLiK.  Sparks announced the FLiK ICO, and that Harris was a co-owner of

FLiK, on Harris' social media accounts, including Twitter and Facebook.  At the

time of the FLiK ICO, Harris had more than 7 million followers on Twitter.  The

announcement of the FLiK ICO that Sparks posted on Harris's social media

accounts, and the assertion Sparks made in those posts that Harris was a co-owner

of FLiK, substantially amplified the reach of FLiK's marketing campaign for the

FLiK ICO.  Sparks made at least one post to Harris's official Twitter and Facebook

accounts that included the FLiK website address, where investors could purchase

FLiK tokens during the ICO.

40.     At Felton's request, Harris also arranged the FLiK ICO to be

promoted on the Twitter, Instagram, and Facebook accounts of a well-known

American actor, comedian, and producer ("Celebrity 1"), who, at the time of the

FLiK ICO, had more than 34 million followers on Twitter.  The announcement of

the FLiK ICO on Celebrity 1's social media accounts also substantially amplified

the reach of FLiK's marketing campaign for the FLiK ICO.

41.     Throughout the FLiK Offering, Felton also anonymously sold millions of FLiK tokens to investors through a so-called "decentralized digital asset trading platform"[2] and through an Australia-based digital asset trading platform (the "Australian Trading Platform"), as discussed below.

42.     From September 1 through September 13, 2017, Felton transferred more than 11 million FLiK tokens to the "decentralized digital asset trading platform" where he began attempting to sell the tokens anonymously to unsuspecting investors.

43.     Also in September 2017, Felton arranged to have FLiK tokens listed for sale on the Australian Trading Platform.  On the day that the FLiK token, which had no restrictions on resale to U.S. investors, was listed for sale on the Australian Trading Platform, Felton deposited more than 17.6 million FLiK tokens into his account at the Australian Trading Platform.  In total, from October 6, 2017, through October 21, 2017, Felton deposited more than 34.7 million FLiK tokens into his account at the Australian Trading Platform.

---

[2]     A "decentralized digital asset trading platform" typically refers to a trading platform where smart contracts (*i.e.* computer code) are utilized to facilitate peer-to-peer trading of digital assets.

*FLiK's Offer and Sale of FLiK Tokens Was an Offering of Securities*

44.     Based upon the foregoing, the FLiK tokens offered and sold in the FLiK Offering were offered and sold as "investment contracts," and thus securities, within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

45.     No registration statement was ever filed or in effect for the offers and sales of FLiK tokens, and no exemption from registration was available for the FLiK Offering.

**B.     Felton and FLiK Engaged in Deceptive Conduct to Defraud FLiK Investors and Made and Disseminated Material Misrepresentations to Sell FLiK Tokens.**

46.     Felton and FLiK knowingly, recklessly, or negligently engaged in deceptive conduct to defraud FLiK investors by, among other acts:

a)     making and disseminating material misstatements to promote FLiK tokens during the FLiK Offering;

b)     diverting 60 million FLiK tokens to Felton's digital asset accounts without disclosing this in the FLiK white paper or on the FLiK website, and then anonymously selling them FLiK tokens on digital asset trading platforms;

c)      continuing to issue materially false and misleading promotional statements to pump up the price and to generate a market to support Felton's dumping of millions of FLiK tokens in sales subsequent to the ICO; and

d)      using the proceeds of the FLiK Offering for Felton's personal use and to purchase luxury goods and gifts rather than for the purposes disclosed in the offering materials.

47.     FLiK and Felton raised approximately $250,000 from investors through the FLiK ICO and at least $2.2 million more through Felton's subsequent FLiK offers and sales in the FLiK Offering.

48.     Felton, the sole owner of FLiK, personally made all the statements on the FLiK website, white paper, social media accounts, including Facebook, Instagram, Twitter, bitcointalk.org, and the Telegram Messaging App ("Telegram"), and other marketing materials.

49.     Felton made and disseminated numerous material misstatements, all of which were to create a false and misleading appearance to investors that FLiK and the FLiK Offering were financially viable or successful as well as financially rewarding for investors who would be able to acquire a purportedly limited supply of FLiK tokens in the FLiK Offering.  These statement appeared on the FLiK

website, white paper, social media accounts, and other marketing materials, including the examples below.

50.    On August 17, 2017, before the FLiK ICO began, Felton transferred 60 million FLiK tokens to himself.  He did not disclose the existence of these tokens or this transfer in the FLiK white paper or otherwise on the FLiK website or social media posts.  This omission was material, as it made other statements about FLiK token's availability for allegedly limited sale and distribution, including the statement regarding the purported FLiK token "burn" (removal from circulation) that would also occur following the FLiK ICO, in the white paper false or misleading.  Felton knew or was reckless in not knowing that his omission of this material fact made the other statements in the white paper false or misleading.

51.    In the marketing materials Felton created when the FLiK ICO began, Felton claimed that FLiK would be a streaming video platform, and that he was finalizing negotiations to license the digital film libraries of several major production studios.  The marketing materials claimed that FLiK tokens would be used to rent or buy digital content on the FLiK platform.

52.    Felton never incorporated FLiK or formed any business entity for the FLiK Offering.  No FLiK streaming platform ever existed.  Felton has admitted that he had no discussions with the production studios with which he claimed to be

finalizing agreements. The misstatements that he made were material, and Felton knew or was reckless in not knowing that these statements were false when he made them.

53.     Also from the beginning of the FLiK Offering, Felton announced on the FLiK website and social media accounts that Harris was a co-owner of FLiK. In fact, Harris was never a co-owner of FLiK. These misstatements made by Felton were material, and Felton knew or was reckless in not knowing that these statements were false when he made them.

54.     On August 20, 2017, the first day of the FLiK ICO, Felton announced that "FLiK has another co-owner, but we can't name him just yet," and that the new co-owner "currently owns a large stake in another video stream platform (one you've heard of)." FLiK never had any co-owners; Felton was its only owner. Felton knew or was reckless in not knowing that these material statements he made were false when he made them.

55.     Within days of launching the FLiK ICO, Felton announced on the FLiK website and in an update to the white paper that "the company has secured a significant investment through a private placement offering in accordance with the Securities & Exchange Commission (SEC) Rule 501 of Regulation D." Felton knew or was reckless in not knowing that these material statements were false

when he made them.  Felton has admitted that he never conducted any private

offering of FLiK, or provided an equity position to anyone other than himself.  No

party made any filing with the Commission pursuant to Regulation D with respect

to FLiK.

56.     Further, Felton made a series of additional material misrepresentations

about FLiK, including misstatements on August 26 and on September 3, 16, and

19, 2017, respectively, regarding a purported private investment in FLiK.

57.     On August 26, 2017, Felton announced on the Telegram messaging

app that FLiK had "a big buyer making a move into FLiK this week . . . buying

$500,000 worth of tokens."  This statement was material, as this would have been

double the full amount raised in the ICO.  Felton knew or was reckless in not

knowing that this misstatement was false when he made it.  No one purchased

$500,000 worth of tokens.

58.     On August 26, 2017, Felton announced that "Yesterday, we received

word that FLiK will be integrated into the new U.S. Military's set-top box.  This

means we'll have access to potentially 2,000,000 customers (1.2M active U.S.

military and 800,000 reserve U.S. military) as soon as our platform is ready.  This

is HUGE news!"  Neither the Department of Defense nor the defense contractor

building the interface for the military's set-top box had any communications with

Felton or any representative of FLiK about integrating FLiK into that interface. These misstatements by Felton were material, and Felton knew or was reckless in not knowing that these statements were false when he made them.

59.     On September 3, Felton announced on Telegram that the buyer who had purportedly purchased $500,000 worth of FLiK tokens actually "didn't receive tokens" but instead "took a small equity position" in FLiK.  He added that the investor had a "significant connection . . . at a large movie studio."  These statements were material, and Felton knew or was reckless in not knowing that these statements were false when he made them.

60.     On September 3, 2017, Felton announced that Individual A, the chairman of a well-known Bitcoin payment-processing company, was handling the listing of FLiK tokens on other trading platforms, and had been recruited to "get things done" for FLiK, including "talking with [another digital-asset payment-processing company] about integrating FLiK tokens into their app."  Felton has admitted that Individual A had no involvement with listing FLiK tokens on any trading platforms, nor was individual A involved in any communications with the other digital-asset payment-processing company about FLiK.  These misstatements by Felton were material, and Felton knew these statements were false when he made them.

61.     On or around September 16, Felton announced that FLiK had raised "over 450 ETH via the ICO and over $2.2M in private equity capital." Felton's statement regarding private equity was material, as $2.2 million in private equity would have been almost ten times the amount Felton actually had raised in the FLiK ICO. Felton knew or was reckless in not knowing that this statement was false when he made it. In fact, the Felton sales that occurred after the ICO phase of the FLiK Offering netted Felton personally approximately $2.2 million. Felton thus invented the private equity investment to mislead investors regarding his transfer of FLiK tokens to himself and his own massive sell-off of FLiK tokens, which were visible to investors on the blockchain, but not publicly traceable to him.

62.     On September 19, Felton announced that the "private equity" investors mentioned three days earlier had "wired funds and we reserved coins for them." This misstatement was material, and Felton knew or was reckless in not knowing that this statement was false when he made it.

63.     Also on September 19, 2017, Felton responded to concerns investors raised about the significant volume of FLiK tokens being sold on the "decentralized digital asset platform" to which Felton had transferred more than 11 million FLiK tokens. In a post on FLiK's Telegram channel, Felton cast the blame

on Harris and promised that Harris would rectify the problem by buying back the tokens.  In fact, Felton has admitted that he never had any information about personal sales by Harris.  This was yet another attempt by Felton to conceal his own massive sales of FLiK tokens to investors at a time when he was misleading investors about the success of the venture.  These misstatements were material, and Felton knew or was reckless in not knowing that these statements were false when he made them.

64.     Also on September 19, 2017, Felton announced that FLiK intended to add music streaming to its platform, but needed "to wait for one of our co-owners to unwind himself from an ownership position in another major music streaming service."  FLiK never had any co-owners; Felton was its only owner.  This misstatement by Felton was material, and Felton knew or was reckless in not knowing that this statement was false when he made it.

65.     Once the FLiK token was listed on the Australian Trading Platform, Felton immediately began selling massive amounts of his own FLiK tokens to the public.  The Australian Trading Platform permitted trading by U.S.-based investors, and U.S.-based investors purchased and sold the FLiK token through the Australian Trading Platform.  On October 6, 2017, Felton sold more than 770,920

FLiK tokens on the Australian Trading Platform, and on October 7, 2017, Felton sold another 1.67 million FLiK tokens on the Australian Trading Platform.

66.    On October 8, 2017, Felton referenced Company A, a digital video software development company, as FLiK's "partner" on FLiK's Telegram channel. FLiK never entered into any partnership with Company A, nor any other arrangement or agreement with Company A. This misstatement Felton made was material, and Felton knew or was reckless in not knowing that this statement was false when he made it.

67.    Also on October 8, 2017, Felton sold more than 3.58 million FLiK tokens and on October 9, 2017, Felton sold another 16.7 million FLiK tokens on the Australian Trading Platform. In total, from October 6, 2017 through October 20, 2017, when the FLiK token's supply was supposed to become more limited through a scheduled "burn" of tokens, Felton increased the supply by selling more than 33.91 million of additional FLiK tokens for Bitcoin and ETH on the Australian Trading Platform to investors, including some investors located in the United States.

68.    On April 3, 2018, Felton posted on the FLiK website that "the OTT (over-the-top) video streaming platform FLiK is deploying is ready to go and has been tested and proven in real-world production environments." FLiK never

deployed nor tested any video streaming platform, nor did it have a video streaming platform "ready to go." These misstatements were material, and Felton knew or was reckless in not knowing that these statements were false when he made them.

69.     On April 12, 2018, Felton sold an additional 42,000 FLiK tokens on the Australian Trading Platform. On June 6, 2018, Felton sold an additional 369,533 FLiK tokens. In total, from October 6, 2017 through June 6, 2018, Felton sold more than 34.39 million FLiK tokens for BTC and ETH on the Australian Trading Platform to investors, including some investors located in the United States. Felton subsequently transferred the proceeds of these sales to financial accounts he controlled.

70.     FLiK and Felton never built a FLiK platform, never licensed content to stream on its envisioned platform, and never had any operations or revenue from operations.

71.     FLiK token-holders have never been able to use their tokens on a FLiK (or any other) platform, which was never created. There is currently no market for FLiK tokens, which have lost essentially all of their value.

72.     Felton obtained approximately $2.5 million in illegal profits from the foregoing fraudulent conduct.

## II.   CoinSpark

### A.   CoinSpark, Felton, White and Smith Engaged in the Unregistered Offer and Sale of Securities through the CoinSpark Offering.

*Felton, White and Smith Launch the CoinSpark ICO*

73.   Even before the FLiK ICO concluded and while Felton continued to conduct the FLiK Offering, Felton began working on his next digital asset securities offering.  Frustrated with his inability to get the FLiK token listed on more digital asset trading platforms, Felton wanted to build his own digital asset trading platform under the name CoinSpark.

74.   Felton registered the CoinSpark website domain in September 2017, and, in October 2017, began meeting with White and Smith, independent contractors who previously worked with Felton on filming commercials, to plan the CoinSpark ICO and the issuance of its token, the SPARK token.

75.   White and Smith prepared marketing materials, including posts for social media, "countdowns," graphics, videos, and other materials for the CoinSpark ICO.  Felton reviewed these materials before they were posted.  White and Smith also met with Felton to discuss logistics, timing, and how they could support the CoinSpark ICO.  They reviewed the CoinSpark ICO white paper, drafted by Felton, and provided feedback to Felton, and discussed the details of the

offering and its terms, including the planned dividend that CoinSpark would pay to all SPARK token-holders, which was disclosed in the white paper.

76.     The white paper provided that SPARK tokens in the CoinSpark ICO would be offered and sold in exchange for ETH.  The white paper and other promotional materials claimed that it was "inevitable" that SPARK tokens would appreciate in value with time, and heavily promoted the CoinSpark "dividend," which would pay out 25% of CoinSpark's profits quarterly to token-holders.  On CoinSpark's website and in the white paper, Felton also touted the future ability to trade SPARK tokens on digital asset trading platforms, including CoinSpark's platform.

77.     The members of the CoinSpark team were not disclosed on the CoinSpark website or in the white paper, and Felton never disclosed to investors that he was the principal behind the CoinSpark ICO.  Felton nevertheless highlighted in the white paper and on CoinSpark's website CoinSpark management's ability to successfully develop its digital asset trading platform. Without disclosing the identities of any of the CoinSpark team members, Felton repeatedly touted the CoinSpark team's "Wall Street" background and "deep roots in crypto."  He also emphasized CoinSpark's claimed partnerships with established organizations.

78.     The SPARK token's value depended entirely upon the development of the digital asset trading platform by the CoinSpark management.  The CoinSpark website and white paper claimed that CoinSpark was actively developing the digital asset trading platform, which Felton claimed was almost ready, and in the final testing phase.

*The CoinSpark ICO Solicited Investors Worldwide, Including in the United States*

79.     Felton launched the CoinSpark ICO on February 14, 2018, announcing that it would run through March 14, 2018.  Before the launch, Felton created a CoinSpark website, on which he published a white paper and other marketing materials.  Felton also tasked Smith with creating CoinSpark social media accounts, and approved the posts Smith made on these accounts.  The website and social media accounts, which were hosted or accessible in the United States, solicited potential investors from around the world, including in the United States.

80.     Felton paid for a Facebook advertising campaign promoting CoinSpark, which ran from December 22, 2017 through January 19, 2018, and which specifically targeted, and reached, users in the United States.  The ad campaign targeted male users, ages 18-45, located in the United States, among

other places, whose interests included Bitcoin, cryptocurrency, Ripple, Ethereum, or Coinbase.

81.     Felton also offered to send a purported private-placement memorandum to any U.S. investors who might be interested in participating in the ICO, and told one U.S. investor who resides in this District and invested in the CoinSpark ICO that the CoinSpark ICO was "accidentally letting US investors slip through the door right now." Felton sent this U.S. investor a link to the CoinSpark ICO website, in case "you know anyone that wants to jump on it." At least one non-accredited U.S. investor located in the Northern District of Georgia invested in the CoinSpark ICO.

*White and Smith Promoted the CoinSpark ICO and the SPARK Tokens*

82.     In addition to running the official CoinSpark social media accounts, Smith set up a Twitter account under the name Greg Ira, which he used to promote the ICO. Greg Ira purported to be a financial journalist with no connection to CoinSpark. The Greg Ira Twitter account never disclosed any connection to CoinSpark, and did not disclose that Felton had promised Smith full-time employment with CoinSpark, at a rate of approximately $60,000 per year, if CoinSpark raised sufficient funds. In early 2018, the Greg Ira account retweeted CoinSpark promotional material, expressed excitement for the CoinSpark ICO, and

tweeted a link to an article that Smith had written under the name Greg Ira, promoting the CoinSpark ICO.

83.     Smith also moderated the CoinSpark Telegram forum, and posted there under both the official CoinSpark Telegram accounts and a false name, "Walter."  Using the "Walter" account, Smith made posts in February 2018 promoting the CoinSpark ICO and in July 2018 encouraging SPARK token-holders to hold onto their tokens rather than taking advantage of the refund CoinSpark was offering.  "Walter" never disclosed any affiliation with CoinSpark other than as an investor, and did not disclose that Felton had promised Smith full-time employment, if CoinSpark raised sufficient funds.

84.     In addition to creating, reviewing, and providing feedback on content for the official CoinSpark social media accounts, in July 2018 White published a promotional article under the pseudonym "CryptoCletus."  In this article, White discussed the value of the SPARK token.  He did not disclose his affiliation with CoinSpark, nor did he disclose that Felton had promised him full-time employment with CoinSpark, if CoinSpark raised sufficient funds.

*CoinSpark's Offer and Sale of SPARK Tokens Was an Offering of Securities*

85.     The SPARK tokens offered and sold in the CoinSpark Offering were offered and sold as "investment contracts" and thus securities within the meaning

of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section

3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

86.     No registration statement was ever filed or in effect for CoinSpark

Offering, and no exemption from registration was available for that offering.

**B.      Felton and CoinSpark Engaged in Deceptive Conduct to Defraud**
**CoinSpark Investors and Made and Disseminated Material**
**Misrepresentations to Sell SPARK Tokens.**

87.     Felton and CoinSpark knowingly, recklessly, or negligently engaged

in deceptive conduct to defraud CoinSpark investors by, among other acts:

a)       making and disseminating material misstatements to promote

SPARK tokens during the CoinSpark ICO;

b)      diverting 24 million unsold SPARK tokens to Felton's own

digital asset accounts for subsequent sale by Felton;

c)      continuing to issue false promotional statements to pump up the

price of SPARK tokens and to generate a market to support Felton's sales of

the SPARK tokens he had diverted to his own account;

d)      engaging in unlawful matched trades to create a false

appearance of trading activity and to artificially increase the trading price of

SPARK tokens; and

e)      using the proceeds of the CoinSpark Offering for Felton's

personal use rather than for the purposes disclosed in the offering materials.

88.     Felton, the sole owner of CoinSpark, personally made the statements

on the CoinSpark website and in its white paper.  Felton made statements, and

approved the statements made by Smith, on the CoinSpark social media accounts,

such as Telegram.

89.     Felton made and disseminated numerous material misstatements, all

of which were to create a false and misleading appearance to investors that

CoinSpark and the CoinSpark ICO were financially viable or successful.  These

statements appeared in the CoinSpark website, white paper, social media accounts,

and other marketing materials, including the examples below.

90.     In the CoinSpark website, white paper, and other offering materials

created and disseminated by Felton, he claimed that he was building an

"international digital asset exchange."  Felton initially promised a June 1, 2018

launch date for the exchange; but from February 5 through April 20, 2018, he

claimed the exchange was on track to launch even earlier, by April 30, 2018.

Felton claimed that the CoinSpark exchange would offer a trading platform for a

number of digital assets, including SPARK tokens, and that SPARK token-holders

could use their SPARK tokens to pay trading fees, which would be discounted to

those paying in SPARK tokens.  Felton claimed that SPARK tokens would entitle token-holders to receive a quarterly dividend of twenty-five percent of CoinSpark's quarterly net profits.

91.     The CoinSpark trading platform was never fully operational, and as Felton used virtually all of the funds raised in the CoinSpark Offering for his own personal use, CoinSpark never turned a profit, and no dividend was ever paid to token-holders.

92.     Felton posted a fake "review" of CoinSpark's ICO to an online publishing platform on January 20, 2018, using the name of an individual who had actually reviewed other ICOs ("Individual 2").  This fake review positively assessed the CoinSpark ICO and the likelihood of a substantial return on the investment; purported to speculate about the millions (or tens of millions) of dollars that had already been invested by the team in building the exchange; posited "rumors" that "the CoinSpark team consists of former and current Wall Street traders and hedge fund players who have been involved with cryptocurrency for the past 5+ years"; and concluded that "I am certainly going to partake in the ICO and I hope you will consider it as well."  The article was also cross-posted on another website on or around January 24, 2018.

93.    These misstatements were material, and were false and misleading. Felton did not "partake in the ICO."  He also did not disclose that he was the sole owner of CoinSpark.  He used a false name to appear disinterested and to lend credibility to his review of his own ICO.  Felton knew or was reckless in not knowing that at the time that he disseminated this article that it was false and misleading, and that readers would be misled by, among other things, his failure to disclose his ownership of CoinSpark.

94.    By at least February 7, 2018, Felton stated on the CoinSpark website that CoinSpark had retained a well-known public-company auditing firm ("Audit Firm"), to "provide world-class external assurance services to verify our accounting and subsequent dividend payments."  Felton further claimed that "[Audit Firm] will perform an external audit (also known as Assurance Services) of the CoinSpark financials twice per year to ensure that our financials are in accordance with FASB (Financial Accounting Standards Board) IASB (International Accounting Standards Board) and U.S. GAAP (United States Generally Accepted Accounting Principles)."  These misstatements were material, and Felton knew or was reckless in not knowing that these statements were false at the time that he made them.

95.     CoinSpark never retained Audit Firm, and Audit Firm never agreed to provide the services described by Felton.  Audit Firm does not offer the services described by Felton.

96.     On or around February 7, 2018, Felton, or someone else acting at his direction, posted on Telegram that CoinSpark was "working with the Cayman government to become the first officially licensed crypto exchange in the country." CoinSpark had no such discussions with the government of the Cayman Islands. These misstatements by Felton were material, and Felton knew or was reckless in not knowing that this statement was false at the time that he made it.

97.     On or around February 7, 2018, Felton, or someone else acting at his direction, stated in a Telegram post that "U.S. investors must be accredited to purchase SPARK.  CoinSpark follows SEC regulations when US buyers are involved."  In fact, Felton permitted non-accredited U.S. investors to purchase SPARK in the CoinSpark ICO and did not follow SEC Regulations with respect to U.S. investors.  These statements by Felton was material, and Felton knew or was reckless in not knowing that at the time that he made these statements that CoinSpark did not follow SEC Regulations with respect to U.S. investors and did not require that U.S. investors be accredited to purchase SPARK.

98.    On February 10, 2018, Felton, or another person acting at Felton's direction, claimed on Telegram that "millions of dollars have already been invested" in CoinSpark "to get things moving and guarantee that the exchange will be developed and launched in April." Millions of dollars had not, and were not ever, invested in CoinSpark; also, the exchange was not developed or launched in April 2018. These misstatements were material, and Felton knew or was reckless in not knowing that these statements were false or misleading when he made them.

99.    On the CoinSpark website and in various offering and promotional materials, as well as on Telegram, Felton claimed, directly or indirectly, that "CoinSpark is run by a team of cryptocurrency experts." Felton has admitted that no member of the CoinSpark team was a "cryptocurrency expert." This misstatement by Felton was material, and Felton knew or was reckless in not knowing that when he made this statement that it was false.

100.    While CoinSpark and Felton arranged for a basic trading platform to be programmed, it was never fully launched. Felton abandoned CoinSpark by September 2018, in favor of new ventures, leaving both the company and the token defunct. The secondary market for SPARK tokens never developed, and very few of the original investors were ever able to sell their tokens, which have lost essentially all of their value.

101.   The CoinSpark Offering raised approximately 460 ETH from investors, which Felton transferred (after the CoinSpark ICO ended) to a wallet address he controlled.

102.   Felton profited from the foregoing fraudulent conduct, diverting to himself approximately $282,418 in illegal proceeds raised from investors.

*Felton Engaged in Manipulative Trading of SPARK Tokens*

103.   After the conclusion of the CoinSpark ICO, Felton engaged in manipulative trading techniques such as wash and matched trading in an attempt to artificially inflate the price of SPARK tokens.

104.   "Matched trades" occur when a person, for the purpose of creating a false or misleading appearance of active trading in a security, enters an order to buy or sell that security with the knowledge that a substantially similar order has been or will be placed to trade the security.

105.   "Wash trades" occur when a security is traded between two accounts with no change in beneficial ownership for the purpose of creating a false or misleading appearance of active trading in the security.

106.   On March 21, 2018, Felton transferred the remaining approximately 24 million unsold SPARK tokens to an ethereum address he controlled for his own personal use. Once SPARK tokens began trading on a "decentralized digital asset

trading platform," Felton transferred small amounts of SPARK tokens to another individual, for use in matched trades on a decentralized trading platform. Felton also transferred hundreds of thousands of SPARK tokens to other ethereum addresses he controlled for that same purpose.

107.   On March 30, Felton suggested to others that they "conference tonight" to "[s]ee how we make it go up 20% quickly." From March 30 through April 3, 2018, Felton and others discussed via text messages Felton's plan to engage in manipulative trading to increase the price of SPARK tokens, including a plan to "buy back and forth to get things going at a good rate." Felton proposed that they trade amongst themselves on the platform to create the false appearance of activity and to create a "floor" for the trading price of SPARK tokens.

108.   During and following these text messages, Felton engaged in manipulative trading of SPARK tokens. In at least eight transactions on April 2, 2018, Felton engaged in matched trades on the decentralized trading platform. On April 12, 2018, Felton also engaged in wash trades between two different ethereum addresses that he controlled.

109.   Felton engaged in this trading activity to enable him to sell the 24 million SPARK tokens that he had misappropriated following the ICO. Nonetheless, he was unable to sell a significant volume of SPARK tokens.

110.   Felton also attempted to list the SPARK token on the Australian Trading Platform as he had with the FLiK token, but neither the Australian Trading Platform nor any other digital asset trading platform listed the SPARK token, and Felton was unable to sell any of his more than 24 million SPARK tokens on the Australian Trading Platform or any other digital asset trading platform.

## III.   The Relief Defendants Received Ill-Gotten Gains.

### A.   Jennifer Felton

111.   In November 2017, shortly after the FLiK Offering, Felton used the proceeds of the FLiK Offering to purchase a new home, which cost more than $1 million.   In October 2017, Felton transferred $2.2 million from his digital asset account to his checking account, and used these funds to purchase a home with his wife, Jennifer Felton.   He used additional funds from the proceeds of the FLiK Offering to purchase a Ferrari, a Chevy Tahoe, furniture, and other luxury goods, which he shared with Jennifer Felton.

112.   In December 2017, Felton used proceeds of the FLiK Offering to purchase approximately $32,000 in jewelry, including a diamond ring and diamond earrings, which he gave to Jennifer Felton that month.

113.   On March 15, 2019, Felton transferred $20,000 from his Hyperion Holdings account to Jennifer Felton.   All of the funds in the Hyperion Holdings

account appear to have originated from the proceeds of the FLiK and CoinSpark Offerings.

114.   In addition to the March 15, 2019 transfer to Jennifer Felton, Felton transferred $11,500 in CoinSpark proceeds from the Hyperion Holdings account to Felton's checking account on November 23 and December 6, 2018.  On January 14, 2019, Felton wrote a check for $5,000 from his checking account to Jennifer Felton.

115.   Finally, between January 7 and March 19, 2019, Felton also transferred approximately $11,400 in Bitcoin prepaid debit cards to Jennifer Felton.  Those Bitcoin prepaid debit cards were loaded with funds from the proceeds of the CoinSpark Offering, which Felton had commingled with his proceeds from the FLiK Offering.

116.   Jennifer Felton did not have a legitimate claim to the home, cars, furniture, or other luxury goods that Felton purchased with the proceeds of the FLiK Offering; nor did she have a legitimate claim to the jewelry that Felton purchased for her with the proceeds of the FLiK Offering.  Jennifer Felton also did not have a legitimate claim to the funds Felton transferred to her from the CoinSpark Offering.

117.   Jennifer Felton's receipt of a home, cars, furniture, other luxury goods, jewelry, and $36,400 in transfers from Felton, from the proceeds of the FLiK Offering and CoinSpark Offering, constitute ill-gotten gains derived from FLiK, CoinSpark, and Felton's violations alleged in this Complaint.

**B.     Dale Felton**

118.   On December 6, 2017, Felton wired $100,000 in proceeds from the FLiK Offering to his father, Dale Felton.  Dale Felton did not have a legitimate claim to these funds, and described them to the staff of the Commission as a loan from Felton that Dale Felton never repaid.

119.   The $100,000 received by Dale Felton from the proceeds of the FLiK Offering constitutes ill-gotten gains derived from FLiK and Felton's violations alleged in this Complaint.

**C.     Stephanie Brown**

120.   On or around February 1, 2018, Felton used the proceeds of the FLiK Offering to make a gift of $18,500 to his sister, Brown.  Brown had no legitimate claim to these funds, and the gift letter signed by Felton states that the funds are "a bona fide gift."

121.   The $18,500 received by Brown from the proceeds of the FLiK

Offering constitutes ill-gotten gains derived from FLiK and Felton's violations

alleged in this Complaint.

### D.   Hyperion Holdings

122.   Felton diverted the proceeds from the CoinSpark Offering to accounts

that he controlled at various digital asset trading platforms.  He converted the funds

into Bitcoin, commingled these funds with proceeds from the FLiK Offering, and

transferred the funds to other accounts that he controlled.

123.   From one of these accounts, Felton purchased a number of prepaid

Bitcoin debit cards, and then transferred approximately $11,400 worth of these

cards to Jennifer Felton, as discussed in paragraph 115.  Using a payment

processing account Felton set up for Hyperion Holdings to enable him to accept

payment in such cards, he cashed out the remaining prepaid Bitcoin cards for

$124,250 in deposits into the Hyperion Holdings checking account, which Felton

controlled.  Felton also arranged for a deposit of $2,660 into the Hyperion

Holdings account on May 11, 2018.

124.   Hyperion Holdings had no legitimate claim to these funds, as it had no

operations and was merely an alter-ego for Felton.  Felton used the Hyperion

Holdings bank account to pay for his personal expenses, including meals,

payments to his criminal defense attorney, and transfers to his personal checking account.

125.   The approximately $127,000 received by Hyperion Holdings from the proceeds of the FLiK and CoinSpark Offerings constitutes ill-gotten gains derived from FLiK, CoinSpark, and Felton's violations alleged in this Complaint.

## FIRST CLAIM FOR RELIEF
## Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c)
### (FLiK, CoinSpark, and Felton)

126.   The Commission repeats and realleges paragraphs 1 through 125 of its Complaint.

127.   By virtue of the foregoing, Defendants FLiK, CoinSpark, and Felton, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

128.   As described herein, FLiK, CoinSpark, and Felton knowingly or recklessly engaged in schemes and deceptive conduct to defraud the FLiK and

CoinSpark investors and made and disseminated material misstatements in FLiK's and CoinSpark's white papers and other marketing materials to sell the FLiK and SPARK tokens during the FLiK and CoinSpark Offerings.

129.   By virtue of the foregoing, Defendants FLiK, CoinSpark, and Felton violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)], promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1)
### (FLiK, CoinSpark, and Felton)

130.   The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

131.   By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants FLiK, CoinSpark, and Felton knowingly or recklessly employed devices, schemes or artifices to defraud.

132.   As described herein, FLiK, CoinSpark, and Felton knowingly or recklessly engaged in schemes to defraud the FLiK and CoinSpark investors and made and disseminated material misstatements in FLiK's and CoinSpark's white

papers and other marketing materials to offer and sell the FLiK and SPARK tokens during the FLiK and CoinSpark Offerings.

133.   By reason of the conduct described above, Defendants FLiK, CoinSpark, and Felton, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1) [15 U.S.C. § 77q(a)(1)].

### THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2) and (3)
### (FLiK, CoinSpark, and Felton)

134.   The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

135.   By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants FLiK, CoinSpark, and Felton negligently obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

136.   As described herein, FLiK, CoinSpark, and Felton negligently made and disseminated material misstatements in FLiK's and CoinSpark's white papers

and other marketing materials in the offer and sell the FLiK and SPARK tokens during the FLiK and CoinSpark Offerings and engaged in transactions, practices or course of business to defraud the FLiK and CoinSpark investors.

137.   By reason of the conduct described above, Defendants FLiK, CoinSpark, and Felton, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(2) and (3) [15 U.S.C. § 77q(a)(2), (3)].

### FOURTH CLAIM FOR RELIEF
### Violations of Exchange Section 9(a)(1)
### (Felton)

138.   The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

139.   By virtue of the foregoing, Defendant Felton directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, for the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security (A) effected transactions in a security which involved no change in the beneficial ownership thereof; or (B) entered an order or orders for the purchase of the security with the knowledge that an order or orders of substantially the same size, at substantially the same price, for the sale of the security had been or would be entered by or for the same or different parties; or

(C) entered any order or orders for the sale of the security with the knowledge that an order or orders of substantially the same size, at substantially the same price, for the purchase of the security had been or would be entered by or for the same or different parties.

140.   As described herein, Felton knowingly or recklessly engaged in unlawful matched trades to create a false appearance of trading activity and to artificially increase the trading price of SPARK tokens.

141.   By reason of the conduct described above, Defendant Felton directly or indirectly violated and, unless enjoined will again violate, Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)].

## FIFTH CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (All Defendants)

142.   The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

143.   As described herein, Defendants FLiK, Felton and Sparks, directly or indirectly, offered and sold via Internet digital asset securities, the FLiK tokens, in the FLiK Offering.  No registration statement was ever filed or in effect for the offers and sales of the FLiK tokens.

144.    As described herein, Defendants CoinSpark, Felton, Smith and White, directly or indirectly, offered and sold via Internet unregistered digital asset securities, the SPARK tokens, in the CoinSpark Offering.    No registration statement was ever filed or in effect for the offers and sales of the SPARK tokens.

145.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

## SIXTH CLAIM FOR RELIEF
**Aiding and Abetting FLiK's and CoinSpark's Violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Felton)**

146.    The Commission repeats and realleges paragraphs 1 through 125 of its Complaint.

147.    By virtue of the foregoing, Defendants FLiK and CoinSpark violated Sections 5(a), 5(c) and 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder through the unregistered offers and sales of the FLiK or SPARK tokens.

148.    Defendant Felton, in the manner set forth above, provided knowing or reckless substantial assistance to these violations by FLiK and CoinSpark.

149.   By virtue of the foregoing, Defendant Felton aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)] promulgated thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## SEVENTH CLAIM FOR RELIEF
### Violations of Section 17(b) of the Securities Act
### (White and Smith)

150.   The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

151.   By virtue of the foregoing, Defendants White and Smith made use of the means and instruments of transportation or communication in interstate commerce or of the mails to publish, give publicity to, or circulate a notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

152.   As described herein, Defendants White and Smith promoted the SPARK tokens under false names, without disclosing that Felton had promised them full-time employment in connection with CoinSpark, if CoinSpark raised sufficient funds.

153.   By reason of the conduct described above, Defendants White and Smith violated and, unless enjoined will again violate, Sections 17(b) of the Securities Act [15 U.S.C. §§ 77q(b)].

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
(All Relief Defendants)

154.   The Commission realleges and incorporates by reference paragraphs 1 through 125, as though fully set forth herein.

155.   By virtue of the foregoing, in the manner described above, Relief Defendants received investor funds and/or ill-gotten gains for which they gave no bona fide consideration and to which they have no legitimate claim.

156.   As described herein, the funds acquired by Relief Defendants are traceable to Felton's wrongful acts and were acquired under circumstances in

which it is not just, equitable or conscionable for Relief Defendants to retain the funds.

157.   By reason of the conduct described above, Relief Defendants have been unjustly enriched and should be required to return their ill-gotten gains.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

## **I.**

A Final Judgment permanently enjoining Defendants from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)];

A Final Judgment permanently enjoining Defendants FLiK, CoinSpark, and Felton from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

A Final Judgment permanently enjoining Defendant Felton from violating Section 9 [15 U.S.C. § 78i];

A Final Judgment permanently enjoining Defendants White and Smith from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

**II.**

A Final Judgment directing Defendants FLiK, CoinSpark, Felton, and Sparks, and all Relief Defendants, to disgorge or return all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, including prejudgment interest thereon;

**III.**

A Final Judgment permanently barring Defendant Felton from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**IV.**

A Final Judgment prohibiting Defendants from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any digital asset security;

**V.**

A Final Judgment directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**VI.**

Such other and further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action issues so triable.

Dated:  New York, New York
        September 10, 2020

Respectfully submitted,

/s/ Richard R. Best
Richard R. Best
John O. Enright
Richard Hong
David H. Tutor
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0056 (Hong)
HongR@sec.gov

Kristina Littman
Carolyn Welshhans
David A. Becker
Virginia  M. Rosado Desilets
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, DC 20549

COUNSEL FOR PLAINTIFF